OSCN Found Document:CDR SYSTEMS CORPORATION v. OKLAHOMA TAX COMMISSION

 
 
 
 OSCN navigation


 
 Home

 
 Courts

 
 Court Dockets

 
 Legal Research

 
 Calendar

 
 Help
 





 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 

 
 
 
 CDR SYSTEMS CORPORATION v. OKLAHOMA TAX COMMISSION
2014 OK 31
Case Number: 109886
Decided: 04/22/2014
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2014 OK 31, __ P.3d __
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

CDR SYSTEMS CORPORATION, Appellant,
v.
OKLAHOMA TAX COMMISSION, Appellee.

CERTIORARI TO THE COURT OF CIVIL APPEALS, DIVISION II, ON APPEAL FROM THE OKLAHOMA TAX COMMISSION

¶0 In September of 2008, Appellant CDR Systems Corporation entered into a stock purchase agreement to sell all of its assets. In August of 2009, CDR filed its 2008 Oklahoma Small Business Corporation Income Tax Return and claimed the Oklahoma Capital Gains Deduction for gains received from the sale. The Oklahoma Tax Commission denied the deduction claimed by CDR because CDR was not headquartered in Oklahoma for three years prior to the sale as required by 68 O.S. Supp. 2008 § 2358(D). The Court of Civil Appeals reversed and found the deduction violated the dormant commerce clause. Upon review, under the facts of this case, we find there is no discrimination against interstate commerce to which the dormant commerce clause applies. We also hold that even if the dormant commerce clause applies in this case, the deduction does not facially discriminate against interstate commerce, it does not have a discriminatory purpose, and the deduction has no discriminatory effect on interstate commerce.

COCA OPINION VACATED; ORDER OF THE OKLAHOMA TAX COMMISSION AFFIRMED

Thomas G. Ferguson, Jr., Walker, Ferguson & Ferguson, Oklahoma City, Oklahoma, Attorney for Appellant
Douglas B. Allen, Larry Patton, Abby Dillsaver, & Elizabeth Field, Oklahoma Tax Commission, Oklahoma City, Oklahoma, Attorneys for Appellee
Kiran A. Phansalkar & Daniel V. Carsey, Conner & Winters, L.L.P., Oklahoma City, Oklahoma, Attorneys for Amicus Curiae Council on State Taxation
Frederick J. Nicely, Council on State Taxation, Washington, DC, Attorney for Amicus Curiae Council on State Taxation

GURICH, J.

¶1 Most, if not all states, have tax incentives whose primary purpose is to attract business to the state and to promote economic development within the state.[1] Oklahoma is no different.[2] The Oklahoma Capital Gains Deduction was passed by the Legislature to promote significant business investment in Oklahoma's economy.[3] Specifically, the deduction found in 68 O.S. Supp. 2008 § 2358(D)(2)(a)(3) ("deduction") is a tax incentive that allows a taxpayer to adjust its Oklahoma taxable income for qualifying gains receiving capital treatment that result from the "sale of all or substantially all of the assets of an Oklahoma company." "Oklahoma company", is defined as "an entity whose primary headquarters have been located in Oklahoma for at least three (3) uninterrupted years prior to the date of the transaction from which the net capital gains arise."[4]

¶2 Although state tax incentives of this kind attempt to promote economic development within the state, certain types of tax incentives raise constitutional concerns because the U.S. Supreme Court has said that "'[n]o State, consistent with the Commerce Clause, may "impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business."'" Westinghouse Elec. Corp. v. Tully, 466 U.S. 388, 403 (1984). In DaimlerChrysler Corp. v. Cuno, 547 U.S. 332 (2006), the U.S. Supreme Court avoided deciding the constitutionality of a state tax credit that incentivized corporations to do business in the state of Ohio, and instead, ruled the city and state taxpayers who challenged the tax credit lacked standing to bring the action.

¶3 Although the Supreme Court didn't directly weigh in on the issue in Cuno, it has said that there is a "delicate balancing of the national interest in free and open trade and a State's interest in exercising its taxing powers." Tully, 466 U.S. at 403. See also Boston Stock Exchange v. State Tax Comm'n, 429 U.S. 318, 329 (1977). This "delicate balancing" requires a "case-by-case analysis and . . . such analysis has left '"much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation."'" Tully, 466 U.S. at 403 (citations omitted). The result in these types of cases often "turns on the unique characteristics of the statute at issue and the particular circumstances in each case." Boston Stock Exchange, 429 U.S. at 329.

Facts & Procedural History

¶4 CDR Systems was incorporated in California in 1970 and manufactures polymer concrete and fiberglass handholes and pads for electric, water, and telephone company utilities.[5] Eugene McGrane has been the sole shareholder of CDR since 1996. At the time of its sale in 2008, CDR was registered to do business in Florida, California, Michigan, Iowa, and Oklahoma, and its primary headquarters was located in Ormond Beach, Florida. CDR's operations in Oklahoma included a manufacturing facility in Waynoka, Oklahoma.

¶5 On September 18, 2008, CDR entered into a stock purchase agreement with Hubbell Lenoir City, Inc. to sell all of CDR's assets. Pursuant to the purchaser's election, the stock sale was treated as an asset sale under the Internal Revenue Code § 338(h)(10). CDR was bound by such election on its Oklahoma Small Business Corporation Income Tax Return.[6] The assets that transferred on September 18, 2008, had been owned by CDR for more than three years. In August of 2009, CDR filed its 2008 Oklahoma Small Business Corporation Income Tax Return, claiming the Oklahoma Capital Gains Deduction for gains received from the $49,776,316 sale of CDR. The total gains received would have resulted in an exclusion from Oklahoma taxable income in the amount of $3,564,283.[7]

¶6 The Compliance Division of the Oklahoma Tax Commission denied the deduction claimed by CDR because CDR was not headquartered in Oklahoma for three years prior to the sale as required by 68 O.S. Supp. 2008 § 2358(D).[8] CDR protested the denial, claiming the statute violated the Privileges and Immunities Clause, the Equal Protection Clause, and the Commerce Clause of the U.S. Constitution.

¶7 The protest was tried to an ALJ on the briefs and stipulated facts. The ALJ denied the protest because the Division's adjustment complied with the statute, and the OTC was without authority to decide the constitutional validity of the tax statute. CDR timely appealed, and COCA found that CDR's Privileges and Immunities argument was without merit because the U.S. Supreme Court has held that a corporation is not a citizen within the meaning of the Privileges and Immunities Clause, citing Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 720 (1978).

¶8 COCA also found that CDR's only contention regarding its Equal Protection claim was that "[i]n other decisions the U.S. Supreme Court has recognized that states cannot discriminate against non-residents and based its decisions on violation of the Equal Protection Clause of the United States Constitution." COCA observed that CDR only cited one case for this proposition, Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869 (1985), and that CDR provided no argument on its equal protection claim and did not show how application of the deduction violated equal protection. CDR did not petition for certiorari on either of these adverse rulings from COCA. As such, neither the Privileges and Immunities Clause nor the Equal Protection Clause is before this Court.[9]

¶9 However, COCA found the deduction discriminated on its face against interstate commerce and its effects on interstate commerce were not evenhanded or incidental. As such, COCA concluded the deduction violated the dormant commerce clause. The OTC petitioned this Court for certiorari review on the issue of whether the statute is an unconstitutional violation of the dormant commerce clause. We granted certiorari on October 14, 2013.

Standard of Review

¶10 In considering a statute's constitutionality, courts are guided by well-established principles and a heavy burden is cast on those challenging a legislative enactment to show its unconstitutionality." Thomas v. Henry, 2011 OK 53, ¶ 8, 260 P.3d 1251, 1254. "Every presumption is to be indulged in favor of the constitutionality of a statute." Id. "It is also firmly recognized that it is not the place of this Court, or any court, to concern itself with a statute's propriety, desirability, wisdom, or its practicality as a working proposition." Fent v. Okla. Capitol Improvement Auth., 1999 OK 64, ¶ 3, 984 P.2d 200, 204. "A court's function, when the constitutionality of a statute is put at issue, is limited to a determination of the validity or invalidity of the legislative provision and a court's function extends no farther in our system of government." Id. In cases where the constitutionality of a state tax statute is at issue, the taxpayer bears the heavy burden of proving the statute is unconstitutional. EOG Res. Mktg., Inc. v. Okla. State Bd. of Equalization, 2008 OK 95, ¶ 13, 196 P.3d 511, 519.

The Dormant Commerce Clause Does Not Apply in this Case

¶11 Article 1, § 8 of the U.S. Constitution "expressly authorizes Congress to 'regulate Commerce with foreign Nations, and among the several states.'" Quill Corp. v. North Dakota By and Through Heitkamp, 504 U.S. 298, 309 (1992). The Commerce Clause "says nothing about the protection of interstate commerce in the absence of any action by Congress. Nevertheless . . . the Commerce Clause is more than an affirmative grant of power; it has a negative sweep as well. The Clause . . . 'by its own force' prohibits certain state actions that interfere with interstate commerce." Id. "The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.'" Gen. Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997) (citations omitted). "No State, consistent with the Commerce Clause, may 'impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business." Boston Stock Exchange, 429 U.S. at 329. The "Commerce Clause does not, however, eclipse the reserved 'power of the States to tax for the support of their own governments.'" Id. at 328.

¶12 In Tracy, 519 U.S. at 282, "Ohio levied a 5% tax on the in-state sales of goods, including natural gas, and it imposed a parallel 5% use tax on goods purchased out-of-state for use in Ohio." "[N]atural gas sales by 'natural gas compan[ies]'" were exempted from all state and local sales taxes. Id. Local natural gas utilities located in Ohio satisfied the definition of natural gas company under Ohio law, but "non-LDC gas sellers, such as producers and independent marketers" did not fall under this definition, and the state denied the exemption to such producers and independent marketers. Id.

¶13 The Tax Commissioner of Ohio applied the general use tax to General Motors, who "bought virtually all the natural gas for its Ohio plants from out-of-state marketers, not LDC's." Id. at 285. General Motors challenged the tax and argued that "Ohio's differential tax treatment of natural gas sales by marketers and regulated local utilities constitute[d] 'facial' or 'patent' discrimination in violation of the Commerce Clause." Id. at 287. General Motors argued that "by granting the tax exemption solely to LDC's, which are in fact all located in Ohio, the State has 'favor[ed] some in-state commerce while disfavoring all out-of-state commerce." Id. at 288.

¶14 The U.S. Supreme Court upheld the Ohio use tax exemption and found that the LDC's provided a product consisting of gas bundled with services and protections, which was different from the unbundled natural gas provided by independent gas marketers. Such difference in products "raise[d] a hurdle for GMC's claim that Ohio's differential tax treatment of natural gas utilities and independent marketers violates our 'virtually per se rule of invalidity,' prohibiting facial discrimination against interstate commerce." Id. at 297-98.

The Court stated:

"Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities. Although this central assumption has more often than not itself remained dormant in this Court's opinions on state discrimination subject to review under the dormant Commerce Clause, when the allegedly competing entities provide different products, as here, there is a threshold question whether the companies are indeed similarly situated for constitutional purposes. This is so for the simple reason that the difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed. If in fact that should be the case, eliminating the tax or other regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors.

Id. at 298-99 (emphasis added).[10]

The Court went on to quote from H.P. Hood & Sons, Inc. v. Du Mond[11] : 

Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

Tracy, 519 U.S. at 300-01 (emphasis added).

¶15 The Court concluded: "Thus, in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply. The dormant Commerce Clause protects markets and participants in markets, not taxpayers as such." Id. at 300 (emphasis added).[12]

¶16 In the case before us, as the OTC points out, the deduction does not target any particular industry or market. Rather, the deduction is available to a qualifying entity participating in any market or industry regardless of whether that entity participates in interstate commerce or intrastate commerce. There is no common market in which substantially similar entities compete under the design of the statute. Entities qualifying for the deduction will likely continue to serve different markets regardless of whether the deduction is available. When asked at oral argument how this particular deduction discriminated against interstate commerce, CDR could not articulate how the deduction discriminates against interstate commerce or even how it affects interstate commerce. CDR makes no assertion that a substantially similar entity that also produced handholes and who had its primary headquarters in Oklahoma received the deduction upon a sale of its assets.

¶17 In fact, the deduction at issue in this case is "quite different from the more familiar targets of Commerce Clause attacks, which, like tariffs, either protect local businesses from multistate competitors or extract tax revenues disproportionately from out-of-state businesses. Whereas the out-of-state challenger to these sorts of provisions can convincingly complain that the state unfairly excluded or penalized outsiders, such pleas are far less compelling when the challenged provision is instead designed to invite, even to entice, the outsiders in."[13] Without any actual or prospective competition in a single market, there is no negative impact on interstate commerce that results from the application of this deduction and no discrimination against interstate commerce to which the dormant commerce clause applies.

Even if the Dormant Commerce Clause Applies in this Case, the Taxpayer Has Failed to Overcome the Heavy Burden of Proving this Deduction is Unconstitutional

1. The Deduction Does Not Facially Discriminate Against Interstate Commerce

¶18 Section 2358(D) treats all taxpayers the same. The deduction is available to "any corporation, trust or estate"[14]

whose gains meet the statutory requirements regardless of whether the company is considered an in-state or out-of-state company. As the OTC pointed out at oral argument, a company domiciled here but that does not have its primary headquarters here will not be eligible for the deduction. Similarly, a company that has its primary headquarters in the state but that hasn't been in existence for three years prior to its sale will not be eligible for the deduction.

¶19 CDR relies on the U.S. Supreme Court's decision in Fulton Corp. v. Faulkner, 516 U.S. 325 (1996), to support its position that the deduction at issue in this case facially discriminates against interstate commerce. In Fulton, the Court invalidated North Carolina's "'intangibles tax'" on a fraction of the value of corporate stock owned by North Carolina residents, a tax that was inversely proportional to the corporation's exposure to the state's income tax. Id. at 327-28. The tax was assessed at a stated rate, but residents "were entitled to calculate their tax liability by taking a taxable percentage deduction equal to the fraction of the issuing corporation's income subject to tax in North Carolina." Id. at 328. So, stock in a corporation doing no business in North Carolina was taxable on 100% of its value, and stock in a corporation doing all its business in North Carolina was not taxed at all. Id.

¶20 In Fulton, the Secretary of Revenue of North Carolina did not dispute that the statute was facially discriminatory. The secretary "relie[d] instead on the compensatory tax defense." Id. at 333. Thus, the issue in Fulton was "whether the taxable percentage deduction [could] be sustained as compensatory." Id. at 334. The Fulton Court rejected North Carolina's defense and found the intangibles tax facially discriminated against interstate commerce, stating: "A regime that taxes stock only to the degree that its issuing corporation participates in interstate commerce favors domestic corporations over their foreign competitors in raising capital among North Carolina residents and tends, at least, to discourage domestic corporations from plying their trades in interstate commerce." Id. at 333.

¶21 The OTC, in the case before us, certainly does not concede that the deduction facially discriminates against interstate commerce. Regardless, Fulton is distinguishable from the present case because the taxing scheme in Fulton actively discouraged participation in interstate commerce by tying tax liability directly to the proportion of in-state versus out-of-state economic activity. However, the deduction in this case does not calculate tax liability based on the proportion of in-state activity to out-of-state activity. Rather, taxpayers subject to Oklahoma income tax receive the deduction for investing in Oklahoma's economy. The degree to which the entity generating the gains participated in out-of-state activity, i.e., interstate commerce, is not relevant to whether the entity qualifies for the deduction. CDR has not, and cannot, argue that the amount of business it did in California, Michigan, Iowa, or Florida somehow affected whether it received the deduction on its Oklahoma income tax liability. CDR cannot point to any language in the statute that calculates tax liability based on the proportion of in-state activity to out-of-state activity.

¶22 Westinghouse Elec. Corp. v. Tully, 466 U.S. 388 (1984) is also distinguishable. In that case, the New York Legislature enacted a franchise tax statute requiring the consolidation of the receipts, assets, expenses, and liabilities of a subsidiary Domestic International Sales Corporation with those of its parent corporation. Id. at 393. "In an attempt to 'provide a positive incentive for increased business activity in New York State,' however, the legislature provided a 'partially offsetting tax credit,'" which was limited to gross receipts from export products "'shipped from a regular place of business of the taxpayer within [New York].'" Id. at 393.

¶23 The Court invalidated the tax credit and was specifically concerned about the statute's effect on activities in other states. The tax credit "ha[d] the effect of allowing a parent a greater tax credit on its accumulated DISC income as its subsidiary DISC move[d] a greater percentage of it shipping activities into the State of New York." Id. at 400. More concerning for the Court was that "the adjustment decrease[d] the tax credit allowed to the parent for a given amount of its DISC's shipping activity conducted from new York as the DISC increase[d] its shipping activities in other States." Id. "[N]ot only [did] the New York tax scheme 'provide a positive incentive for increased business activity in New York State, but also it penalize[d] increases in the DISC's shipping activities in other States." Id. at 400-01 (citations omitted) (emphasis added).

¶24 Unlike in Tully, in Oklahoma, a company does not disqualify for the deduction because it increases its activities in another state. As the OTC points out, nothing in the statute prevents companies from simultaneously claiming exemptions they may be entitled to in other states for a sale of all or substantially all of their assets. The deduction is a tool used by the state to compete for business investment in Oklahoma's economy by granting the tax deduction to both in-state and out-of-state businesses based on the extent of their activities in the State of Oklahoma. The deduction does not penalize the out-of-state activities of corporations doing business in Oklahoma. The deduction does not discriminate against interstate commerce on its face.[15]

2. The Deduction Does Not Have a Discriminatory Purpose

¶25 The Oklahoma Capital Gains Deduction was passed by the Legislature to promote significant business investment in Oklahoma's economy. The U.S. Supreme Court has said that "[t]he modern law of what has come to be called the dormant Commerce Clause is driven by concern about 'economic protectionism--that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" Davis, 553 U.S. at 337-38 (emphasis added).[16] Encouraging investment in Oklahoma's economy is not economic protectionism because the deduction in no way burdens out-of-state competitors; rather, the deduction is a mechanism to entice those out-of-state companies to locate in state.

¶26 In Trinova Corp. v. Michigan Dep't of Treasury, 498 U.S. 358 (1991), the U.S. Supreme Court upheld the constitutionality of Michigan's single business tax. Michigan's single business tax was a value added tax levied against entities having business activity within the state. Id. at 362. A taxpayer doing business both in and out of the state determined its apportioned tax in Michigan based on among other things, its business activity attributable to Michigan, including its Michigan payroll, its property located in Michigan, and its Michigan sales. Id. at 367-68.

¶27 The Court held the statute was not facially discriminatory. Trinova maintained that the single business tax discriminated against interstate commerce because the statute had a discriminatory purpose. Trinova relied on a statement by the Governor of Michigan that the tax was enacted to "'promote the development and investment of business within Michigan.'" Id. at 385. The Court found: "This statement helps Trinova not at all. It is a laudatory goal in the design of a tax system to promote investment that will provide jobs and prosperity to the citizens of the taxing State. States are free to 'structur[e] their tax systems to encourage the growth and development of intrastate commerce and industry.'" Id. at 385-86 (emphasis added). See also Boston Stock Exchange, 429 U.S. at 327 ("Our decision today does not prevent the States from structuring their tax systems to encourage the growth and development of intrastate commerce and industry. Nor do we hold that a State may not compete with other States for a share of interstate commerce; such competition lies at the heart of a free trade policy. We hold only that in the process of competition no State may discriminatorily tax the products manufactured or the business operations performed in any other State.").

¶28 As was the case in Trinova, CDR has presented no evidence "to demonstrate an impermissible motive" on the part of the State of Oklahoma in enacting this particular deduction. Trinova, 498 U.S at 386. Nothing in the record indicates this deduction was passed to discriminatorily tax products manufactured in another state or to discriminatorily tax the business operations performed in any other state. As such, the deduction does not have a discriminatory purpose.

3. The Deduction Has No Discriminatory Effect on Interstate Commerce

¶29 In Boston Stock Exchange, the Court found New York's transfer tax on securities transactions violated the commerce clause where transactions involving out-of-state securities sales were taxed more heavily than transactions involving a sale of securities within the state. Boston Stock Exchange, 429 U.S. at 336. The Court found the statute "foreclose[d] tax-neutral decisions" by forcing a nonresident contemplating the sale of securities to choose between two possible tax burdens. Id. at 331. "[T]he choice of exchange by all nonresidents . . . [was] not made solely on the basis of nontax criteria." Id. "[T]he seller [could not] escape tax liability by selling out of State, but [could] substantially reduce his liability by selling in State. The obvious effect of the tax [was] to extend a financial advantage to sales on the New York exchanges at the expense of the regional exchanges." Id.

¶30 CDR has never argued that this deduction somehow precluded it from making a tax-neutral decision with respect to its decision to sale its assets. CDR's decision to maintain its primary headquarters in Florida was because the owner lived in Florida and it was the most practical location. Additionally, CDR revealed at oral argument it has been in Oklahoma since around 1986 and did not initially come to Oklahoma because of this particular tax incentive or any other tax incentive provided for in the Oklahoma statutes. All decisions by CDR were made solely on the basis of nontax criteria. On the record before us, the deduction does not preclude tax-neutral decision-making as the Court was concerned about in Boston Stock Exchange.

¶31 In Pike v. Bruch Church, Inc., 397 U.S. 137, 139 (1970), Bruce Church, Inc., grew cantaloupes in Parker, Arizona. Because the company lacked packing sheds in Parker, it transported the cantaloupes to its nearby facilities in California, where the cantaloupes were sorted, inspected, packed, and shipped in containers bearing the name of the California packer. Id. The official charged with enforcing the Arizona Fruit and Vegetable Standardization Act, which was designed to prevent deceptive packaging, entered an order prohibiting the company from shipping its cantaloupes outside the state unless they were packed in containers in a manner approved by the official to ensure the cantaloupes could be identified as of Arizona origin. Id. at 138. The company brought suit and challenged the constitutionality of the order, which would have had the effect of requiring the company to build packing facilities in or near Parker, Arizona, at a cost of about $200,000. Id. at 140.

¶32 The U.S. Supreme Court found the official's order issued under the Arizona statute unconstitutionally burdened interstate commerce because the "[s]tate's tenuous interest in having the company's cantaloupes identified as originating in Arizona [could not] constitutionally justify the requirement that the company build and operate an unneeded $200,000 packing plant in the [s]tate." Id. at 145. The Court went on: "[T]he Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home [s]tate that could more efficiently be performed elsewhere." Id.

¶33 In the case before us, the record is void of any evidence that CDR considered relocating so as to receive this deduction when it sold its assets. CDR has never alleged that it did not relocate because the relocation would have been financially burdensome or that relocation was impossible because operations could be performed more efficiently in Florida. In Pike, the company faced imminent loss of its anticipated 1968 cantaloupe crop in the amount of $700,000 if it was forced to build a packing facility in Arizona. The record in this case simply does not rise to the level of coercive relocation demonstrated in Pike. Although CDR argues the primary headquarters requirement discriminates against interstate commerce, hypothetical speculation about the cost an out-of-state company might incur in locating its primary headquarters in Oklahoma, without more, cannot support a determination that this deduction has the effect of discriminating against interstate commerce.[17]

¶34 The deduction at issue in this case has a legitimate purpose.[18] As discussed above, structuring the state's tax system to encourage the growth and development of intrastate commerce and industry is a legitimate purpose. See Trinova, 498 U.S. at 385-86. But as the OTC also pointed out at oral argument, the state's jurisdiction to tax property and income is limited to that which is either owned in the state or else conducted in the state. For the State of Oklahoma to levy a tax on intangible property, the locus of that property must be in Oklahoma. Counsel for OTC explained that the main intangible involved in the sale of assets by CDR was goodwill. The locus of intangible property, i.e. goodwill, is generally the primary headquarters of the company. Thus, the primary headquarters requirement ensures that the gains which qualify for the deduction, namely intangible property, have some nexus to property actually within Oklahoma's taxing jurisdiction. The State of Oklahoma is not obligated to permit a deduction for income it cannot tax.[19]

¶35 Additionally, as the OTC points out, the Legislature could have imposed a more burdensome means of promoting significant business investment in Oklahoma's economy. It could have required companies to be domiciled in Oklahoma to receive the deduction or to incorporate in Oklahoma to receive the deduction or to operate only in the State of Oklahoma to receive the deduction. Instead, the Legislature chose the three-year primary headquarters requirement to promote significant business investment in Oklahoma's economy. Such a determination is a policy consideration left to the Legislature.

¶36 Even if CDR could prove this particular deduction somehow burdens interstate commerce, we would be unable to reliably determine whether the burdens imposed on interstate commerce by this deduction are clearly excessive in relation to its local benefits. Disagreement exists about whether state tax incentives designed to promote investment in a state's economy actually benefit the state.[20] The U.S. Supreme Court has said that courts are "institutionally unsuited to gather facts upon which economic predictions can be made,"[21] and are "'poorly equipped to evaluate with precision the relative burdens of various methods of taxation.'"[22] Again, we leave the cost-benefit analysis of this particular state tax incentive to the Legislature.

Conclusion

¶37 CDR has failed to carry the heavy burden of proving this particular deduction unconstitutionally discriminates against interstate commerce. We hold there is no discrimination against interstate commerce to which the dormant commerce clause applies, and that even if the dormant commerce clause applies in this case, the deduction does not facially discriminate against interstate commerce, it does not have a discriminatory purpose, and the deduction has no discriminatory effect on interstate commerce. The OTC properly denied the capital gains deduction to CDR.

COCA OPINION VACATED; ORDER OF THE OKLAHOMA TAX COMMISSION AFFIRMED

¶38 REIF, V.C.J., KAUGER, WINCHESTER, TAYLOR, GURICH, JJ., concur.

¶39 COLBERT, C.J., WATT, EDMONDSON, COMBS (by separate writing)JJ., dissent.

FOOTNOTES

[1] See Philip M. Tatarowicz, Federalism, The Commerce Clause, and Discriminatory State Tax Incentives: A Defense of Unconditional Business Tax Incentives Limited to In-State Activities of the Taxpayer, 60 Tax Law. 835, 845-48 (2007) (discussing the array of different tax incentives offered to businesses to promote economic development within the states).

[2] The deduction at issue in this case is just one of many tax incentives aimed at promoting investment in Oklahoma's economy. See, e.g., 68 O.S. Supp. 2010 § 2357.4; 68 O.S. Supp. 2008 § 2357.7; 68 O.S. §§ 3601-3612; 68 O.S. §§ 3701-3712; 68 O.S. §§ 3901-3910.

[3] Answer Brief of Appellee at 8.

[4] Section 2358(D) reads in its entirety:

D. 1. For taxable years beginning after December 31, 2005, the taxable income of any corporation, estate or trust, shall be further adjusted for qualifying gains receiving capital treatment. Such corporations, estates or trusts shall be allowed a deduction from Oklahoma taxable income for the amount of qualifying gains receiving capital treatment earned by the corporation, estate or trust during the taxable year and included in the federal taxable income of such corporation, estate or trust.

2. As used in this subsection:

a. "qualifying gains receiving capital treatment" means the amount of net capital gains, as defined in Section 1222(11) of the Internal Revenue Code, included in the federal income tax return of the corporation, estate or trust that result from:

(1) the sale of real property or tangible personal property located within Oklahoma that has been directly or indirectly owned by the corporation, estate or trust for a holding period of at least five (5) years prior to the date of the transaction from which such net capital gains arise,

(2) the sale of stock or on the sale of an ownership interest in an Oklahoma company, limited liability company, or partnership where such stock or ownership interest has been directly or indirectly owned by the corporation, estate or trust for a holding period of at least three (3) years prior to the date of the transaction from which the net capital gains arise, or

(3) the sale of real property, tangible personal property or intangible personal property located within Oklahoma as part of the sale of all or substantially all of the assets of an Oklahoma company, limited liability company, or partnership where such property has been directly or indirectly owned by such entity owned by the owners of such entity, and used in or derived from such entity for a period of at least three (3) years prior to the date of the transaction from which the net capital gains arise,

b. "holding period" means an uninterrupted period of time. The holding period shall include any additional period when the property was held by another individual or entity, if such additional period is included in the taxpayer's holding period for the asset pursuant to the Internal Revenue Code,

c. "Oklahoma company", "limited liability company", or "partnership" means an entity whose primary headquarters have been located in Oklahoma for at least three (3) uninterrupted years prior to the date of the transaction from which the net capital gains arise,

d. "direct" means the taxpayer directly owns the asset, and

e. "indirect" means the taxpayer owns an interest in a pass-through entity (or chain of pass-through entities) that sells the asset that gives rise to the qualifying gains receiving capital treatment.

(1) With respect to sales of real property or tangible personal property located within Oklahoma, the deduction described in this subsection shall not apply unless the pass-through entity that makes the sale has held the property for not less than five (5) uninterrupted years prior to the date of the transaction that created the capital gain, and each pass-through entity included in the chain of ownership has been a member, partner, or shareholder of the pass-through entity in the tier immediately below it for an uninterrupted period of not less than five (5) years.

(2) With respect to sales of stock or ownership interest in or sales of all or substantially all of the assets of an Oklahoma company, limited liability company, or partnership, the deduction described in this subsection shall not apply unless the pass-through entity that makes the sale has held the stock or ownership interest or the assets for not less than three (3) uninterrupted years prior to the date of the transaction that created the capital gain, and each pass-through entity included in the chain of ownership has been a member, partner or shareholder of the pass-through entity in the tier immediately below it for an uninterrupted period of not less than three (3) years.

68 O.S. Supp. 2008 § 2358(D).

[5] CDR is a corporation electing treatment as an "S Corporation" for tax purposes. Record on Appeal at 14.

[6] See 68 O.S. Supp. 2013 § 2353(3) ("For all taxable periods covered by the Oklahoma Income Tax Act, the tax status and all elections of all taxpayers covered by the Oklahoma Income Tax Act shall be the same for all purposes material hereto as they are for federal income tax purposes except when the Oklahoma Income Tax Act specifically provides otherwise."); In the Matter of Income Tax Protest of Flint Res. v. State of Okla. ex rel. Okla. Tax Comm'n, 1989 OK 9, ¶ 19, 780 P.2d 665, 673 ("The language of § 2353(3) and (12), indicates that the Legislature intended that federal elections be controlling in determining Oklahoma taxable income.").

[7] CDR included the gains received from the sale of CDR as a capital gain on its 2008 Form 1120S Federal Income Tax Return. Record on Appeal at 15.

[8] See Record on Appeal at 3:

Explanation of Adjustments:

A) Taxes based on or measured by income shall not be allowed as a deduction in arriving at apportionable income (including Foreign Income Tax). 68 O.S. Section 2358(A)(5) and Permanent Rule 710:50-17-51(1).

B) Deductions incurred in producing income of a non-unitary nature shall be allocated on the same basis as the income. 68 O.S. Section 2358(A)(4) and Permanent Rule 710:50-17-51(18).

C) The deduction for qualifying gains receiving capital treatment on the sales of assets of a foreign based corporation has been denied. O.S. 68 Section 2358(D) and Permanent Rule 710:50-15-48.

D) Net rental income from non-unitary property is to be separately allocated. 68 O.S. Section 2358(A)(4) and Permanent Rule 710:50-17-51(12).

E) The sales factor shall include only sales (line 1, form 1120) and does not include sales or revenue from items other than sales to be included in the formula even though other types of income (royalties, interest, capital gains, and other income) are included in the apportioned income. 68 O.S. Section 2358(A)(5)(c) and Permanent Rule 710:50-17-71(1)(A).

[9] Okla. Sup. Ct. R. 1.180(b).

[10] See also Amerada Hess Corp. v. Dir. of Taxation, New Jersey Dep't of Treasury, 490 U.S. 66, 78 (1989) ("Whatever different effect the add-back provision may have on these two categories of companies results solely from differences between the nature of their businesses, not from the location of their activities.") (emphasis added); Alaska v. Arctic Maid, 366 U.S. 199, 204-05 (1961) (finding that owners of freezer ships and owners of cold storage facilities served separate markets, did not compete with one another, and thus could not be compared for Commerce Clause purposes).

[11] 336 U.S. 525, 539 (1949).

[12] See also Exxon Corp. v. Governor of Md., 437 U.S. 117, 127-28 (1978) ("[T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations.").

[13] Peter D. Enrich, Saving the States from Themselves: Commerce Clause Constraints on State Tax Incentives for Business, 110 Harv. L. Rev. 377, 412 (1996) (emphasis added).

[14] 68 O.S. Supp. 2008 § 2358(D) (emphasis added).

[15] Where a state law facially discriminates against protected commerce, the U.S. Supreme Court has applied a virtually per se rule of invalidity. Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 338 (2008). If a state statute facially discriminates against interstate commerce, the statute "will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" Id. "In this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338 (2007). This strictest of strict scrutiny "is an extremely difficult burden, 'so heavy that facial discrimination by itself may be a fatal defect.'" Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 582 (1997).

[16] Even if the statute does not discriminate on its face, if a discriminatory purpose is unavoidably clear, the statue will still be subject to strict scrutiny. Amerada Hess Corp., 490 U.S. at 75-76 (citing Bacchus Imports, Ltd. v. Dias, 468 U.S. 263 (1984)).

[17] If a statute has the effect of unduly burdening interstate commerce, it may also be subjected to strict scrutiny. Amerada Hess Corp., 490 U.S. at 75 (citing American Trucking Ass'n, Inc. v. Scheiner, 483 U.S. 266 (1987)).

[18] If a statute "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Pike, 397 U.S. at 142.

[19] Further, CDR and the purchaser elected to treat the sale as a sale of assets for federal tax purposes. Under Oklahoma law, the taxpayer is bound by that election. While a deduction would have been allowed for the sale of real estate and equipment under § 2358(D)(2)(a)(1), CDR chose to pursue a course of action that maximized its tax savings by characterizing the sale as a sale of assets.

[20] See Enrich, supra note 13 at 389-97.

[21] Tracy, 519 U.S. at 308.

[22] Fulton, 516 U.S. at 342. Even "'expert economists' may have difficulty determining 'whether the overall economic benefits and burdens of a regulation favor local inhabitants against outsiders." Tracy, 519 U.S. at 308-09 (quoting Michael E. Smith, State Discriminations Against Interstate Commerce, 74 Calif. L. Rev. 1203, 1211 (1986)).

COMBS, J., dissenting.

¶1 I disagree with the majority's holding that the deduction found in 68 O.S. Supp. 2007, § 2358 (D)(2)(a)(3), does not discriminate against interstate commerce. I believe this deduction is facially discriminatory or at least discriminatory in effect against interstate commerce and violates the dormant Commerce Clause of the United States Constitution. I also disagree with the majority's reliance on Gen. Motors Corp. v. Tracy, 519 U.S. 278, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997). The majority opinion asserts pursuant to Tracy, competition in a single market by similarly situated entities is a requirement for finding discrimination against interstate commerce. However, other cases discussed infra, such as Fulton Corp. v. Faulkner, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), found a dormant Commerce Clause violation when there was no competition in any single market.

¶2 The Commerce Clause, found in Article I, § 8, cl. 3 of the United States Constitution, provides in pertinent part, "[t]he Congress shall have Power . . . to regulate commerce . . . among the several states . . . ." The purpose of the Commerce Clause is to impose a limit on states' powers in order to create an area of free trade among the several states.[1] The Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the states, but by its own force it created an area of trade free from interference by the states.[2] The Commerce Clause is the source of constitutional limits imposed on a state's ability to interfere with interstate commerce through regulation and taxation; this implied restriction on state regulation of interstate commerce is known as the negative or "dormant commerce clause."[3] This Court has previously determined the dormant Commerce Clause's limitations apply not just to taxation but also to discriminatory tax exemptions.[4]

¶3 The United States Supreme Court has held when asked "to make the delicate adjustment between the national interest in free and open trade and the legitimate interest of the individual States in exercising their taxing powers . . . the result turns on the unique characteristics of the statute at issue and the particular circumstances in each case. This case-by-case approach has left 'much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation.'" Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 328, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977) (quoting Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 457, 79 S.Ct. 357, 362, 3 L.Ed.2d 421 (1959)). The Court in Boston also found "the prohibition against discriminatory treatment of interstate commerce follows inexorably from the basic purpose of the Clause. Permitting individual States to enact laws that favor local enterprises at the expense of out-of-state businesses 'would invite a multiplication of preferential trade areas destructive' of the free trade which the Clause protects." Boston, 429 U.S. at 329 (quoting Dean Milk Co. v. Madison, 340 U.S. 349, 356, 71 S.Ct. 295, 299, 95 L.Ed.329 (1951)). Boston also noted a state "tax may not discriminate between transactions on the basis of some interstate element."[5]

¶4 The first step is to determine whether the challenged law discriminates against interstate commerce or whether it regulates evenhandedly with only incidental effects on interstate commerce.[6] If the law is non-discriminatory (i.e., regulates evenhandedly) and has only incidental effects on interstate commerce, it will be found to be valid, unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.[7] This test is known as the Pike balancing test. See Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). If a legitimate local purpose exists for the challenged law, then the question becomes one of degree; the extent of the burden tolerated will depend on the nature of the local interest involved and whether it could be promoted with a lesser impact on interstate activities.[8] If the law regulates evenhandedly, then the burden of proof lies on the challenger to show the incidental burden on interstate commerce is excessive compared to the local interest.[9]

¶5 By contrast, if a law discriminates against interstate commerce either "on its face or in its practical effect," it is subject to the strictest scrutiny.[10] The Pike balancing test is not the appropriate legal standard in such a case.[11] When considering the stated purpose of the challenged law, the court will not be bound by the name, description or characterization given by the legislature but will determine for itself its practical impact.[12] Discrimination in this context simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.[13] If the law discriminates against interstate commerce it will be found to be virtually per se invalid.[14] Once a law is determined to be virtually per se invalid, that finding can only be overcome by a showing it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.[15] In such a case, the burden of proof shifts to the governmental entity to prove the legitimacy of the purported local interest and the lack of an alternative means to further the local interest with less impact on interstate commerce.[16] However, the state's burden is so heavy that facial discrimination by itself may be a fatal defect.[17]

¶6 The deduction found in 68 O.S. Supp. 2007, § 2358 (D)(2)(a)(3) became effective January 1, 2008, pursuant to SB 685, 2007 Okla. Sess. Laws c. 346, § 3. The technical explanation of this deduction is as follows: a corporation, estate or trust is allowed to take a deduction from Oklahoma taxable income for the net capital gains received and included on its federal return that resulted from the sale of real property and/or tangible or intangible personal property located in Oklahoma that was part of a sale of all or substantially all the assets (asset sale), directly or indirectly, owned by an Oklahoma Company or by the owners of such Oklahoma Company and such property had been used or derived by such company at least 3 years prior to the sale. The statute provides, an Oklahoma company, limited liability company or partnership means an entity whose primary headquarters have been located in Oklahoma for at least three (3) uninterrupted years prior to the date of the transaction from which the net capital gains arise. For purposes of my dissent, I will refer to this as an "Oklahoma Company." In other words, if a corporation, estate or trust is in a position to receive net capital gains from an asset sale of an Oklahoma Company (having some ownership interest in an Oklahoma Company or is itself the Oklahoma Company) it can deduct those applicable net capital gains earned from the sale from its Oklahoma taxable income as long as it claimed such gains on its federal income tax return. The deduction is only allowed if the company selling all its assets had its primary headquarters in Oklahoma for 3 years prior to the sale and is therefore based on the level of activity that company initiated in the State. Here, even though CDR had made a significant investment in the State by operating a physical plant employing Oklahomans in Waynoka, it could not claim this deduction. CDR is a Subchapter S corporation with a single shareholder, who happens to choose to live in Florida; CDR's principle place of business.[18]

¶7 In the present case, CDR is both the corporation claiming the deduction and the company that sold all its assets. The Tax Commission asserted if CDR were an Oklahoma Company it otherwise would have qualified for the deduction.[19] However, CDR was denied this deduction because it did not have its primary headquarters in Oklahoma. CDR argued the primary headquarters requirement discriminates against interstate commerce on its face and in effect pursuant to Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). In Complete Auto the Supreme Court reasoned that in previous cases concerning the Commerce Clause, it has:

considered not the formal language of the tax statute but rather its practical effect, and have sustained a tax against Commerce Clause challenge when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.

Complete Auto Transit, Inc. v. Brady, 430 U.S. at 279 (emphasis added).

These considerations make up the four-prong Complete Auto test.[20] CDR argued the deduction does not meet the third prong of this test.

¶8 CDR also asserted in its Response to Petition for Certiorari that the issue is "not merely whether a state tax provision discriminates against non-resident taxpayers; the standard is whether such a provision 'taxes a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State.'" (Quoting Fulton Corp. v. Faulkner, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996)). CDR also relied on Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 332, n. 12, 97 S.Ct. 599, 608, n. 12, 50 L.Ed.2d 514 (1977), wherein the Supreme Court noted a state tax "may not discriminate between transactions on the basis of some interstate element." CDR further asserted, a "State may no more use discriminatory taxes to assure that nonresidents direct their commerce to business within the State than to assure that residents trade only in intrastate commerce." Boston, 429 U.S. at 334-35.

¶9 The majority opinion asserts the deduction applies to any corporation, estate or trust and therefore does not facially discriminate against interstate commerce. It places the burden of proof on CDR under a Pike balancing test which determines whether any burden on interstate commerce is clearly excessive in relation to the putative local benefits. The majority opinion also concludes courts are ill-equipped to make such assessments.

¶10 Here, the deduction is only allowed if the company selling all or substantially all of its assets has its primary headquarters in Oklahoma for at least three years prior to the asset sale. The primary headquarters requirement makes the deduction one based upon the level of business a company conducts in Oklahoma. In its Answer Brief, the Tax Commission stated the self-evident purpose of this deduction is to "promote significant investment in Oklahoma's economy by offering incentives to those investing in companies doing business here. The end goal of requiring significant investment in Oklahoma is to retain that investment and any subsequent investment within the state, thus boosting the state's economy on a long-term basis." The goal is essentially to promote business in Oklahoma by offering a tax incentive to taxpayers investing in companies which have a significant presence in the state (primary headquarters). The question is whether or not the deduction has a discriminatory effect on interstate commerce. Similar tax schemes have been found to violate the Commerce Clause.

¶11 Unlike the majority opinion, I believe the United States Supreme Court cases of Westinghouse Elec. Corp. v. Tully, 466 U.S. 388, 104 S.Ct. 1856, 80 L.Ed.2d 388 (1984) and Fulton Corp. v. Faulkner, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), are pertinent and applicable to this case. In Westinghouse Elec. Corp. v. Tully, 466 U.S. 388, 104 S.Ct. 1856, 80 L.Ed.2d 388 (1984), New York enacted a franchise tax requiring the consolidation of the receipts, assets, expenses, and liabilities of a parent corporation with any of its subsidiary domestic international sales corporations (DISC). The tax was assessed against the parent corporation on the basis of the consolidated amounts. The tax statute also provided an offsetting tax credit. The credit was limited to gross receipts from export products shipped from a regular place of business of the taxpayer in New York. The Court found this taxing scheme had "the effect of treating differently parent corporations that are similarly situated in all respects except for the percentage of their DISC's shipping activities conducted in New York." Westinghouse Elec. Corp., 466 U.S. at 400. It determined the tax scheme not only provided an incentive for increased business activity in New York but it also would penalize increased shipping activity in other states. Id. at 401.

¶12 In finding a Commerce Clause violation, the Court relied upon the basic principle that the very purpose of the Commerce Clause is to create an area of free trade among the several states. Id. at 402. The Court quoted from its previous decisions holding "[n]o State, consistent with the Commerce Clause, may 'impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business.'" (Citations omitted). The Court found it has "struck down state tax statutes that encouraged the development of local industry by means of taxing measures that imposed greater burdens on economic activities taking place outside the State than were placed on similar activities within the State." Id. at 403-04 (citing Maryland v. Louisiana, 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) and Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977)). While the Federal Government may grant tax advantages to those who produce in the United States, a state "may not encourage the development of local industry by means of taxing measures that 'invite a multiplication of preferential trade areas' within the United States in contravention of the Commerce Clause." Id. at 405 (citing Dean Milk Co. v. Madison, 340 U.S. 349, 356, 71 S.Ct. 295, 299, 95 L.Ed. 329 (1951)). The Court further found it made no difference that New York discriminated against business carried on outside the state by disallowing a tax credit rather than by imposing a higher tax; the discriminatory economic effect would be identical. Id. at 404.

¶13 The New York Tax Commission in Westinghouse argued even if the tax is discriminatory the burden it placed on interstate commerce was not of constitutional significance and the actual effect of the tax credit was only slight compared to the entire taxing scheme. Westinghouse Elec. Corp., 466 U.S. at 405. It asserted the credit was not intended to divert new activity into New York but rather to prevent the loss of economic activity already in the state at the time the tax was enacted. Id. at 406. The Supreme Court, however, determined "[w]hether the discriminatory tax diverts new business into the State or merely prevents current business from being diverted elsewhere, it is still a discriminatory tax that 'forecloses tax-neutral decisions and ... creates ... an advantage' for firms operating in New York by placing 'a discriminatory burden on commerce to its sister States.'" Id. at 406 (quoting Boston Stock Exch., 429 U.S. at 331). It found the state violated the prohibition in Boston "against using discriminatory state taxes to burden commerce in other States in an attempt to induce 'business operations to be performed in the home State that could more efficiently be performed elsewhere.'" Id. (quoting Boston Stock Exch., 429 U.S. at 336). The Court was concerned the taxing scheme would "impose an artificial rigidity on the economic pattern of the industry." Id. at 406 (quoting Pike 397 U.S. at 146).

¶14 In Fulton Corp. v. Faulkner, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), North Carolina levied an intangibles tax on the fair market value of corporate stock owned by residents of North Carolina or having a business, commercial, or taxable situs in the state. State residents, however, were allowed a tax deduction equal to the fraction of the issuing corporation's income that was subject to North Carolina corporate income tax; i.e., the more business the corporation did in North Carolina, the less tax the resident stockholder would have to pay. The Supreme Court found:

A regime that taxes stock only to the degree that its issuing corporation participates in interstate commerce favors domestic corporations over their foreign competitors in raising capital among North Carolina residents and tends, at least, to discourage domestic corporations from plying their trades in interstate commerce.

Fulton Corp., 516 U.S. at 333.

The intangibles tax was based upon the amount of business a corporation participates in interstate commerce (the more business it does out of state, the more its stock is taxed); it favored corporations who do business in North Carolina by helping them to raise capital because their stocks would be more lucrative with North Carolina residents since they were not taxed as highly. The taxing scheme also discouraged domestic corporations from engaging in interstate commerce because the amount of interstate commerce they engaged in would subject their stock to more taxation.

¶15 The State suggested the tax was so small it would have no practical impact on interstate commerce; however, the Court noted "we have never recognized a 'de minimis' defense to a charge of discriminatory taxation under the Commerce Clause." Fulton Corp., 516 U.S. at 333, n.3 (quoting Maryland v. Louisiana, 451 U.S. 725, 760, 101 S.Ct. 2114, 2135, 68 L.Ed.2d 576 (1981) ("[w]e need not know how unequal the Tax is before concluding that it unconstitutionally discriminates"); Associated Indus. of Mo. v. Lohman, 511 U.S. 641, 650, 114 S.Ct. 1815, 1822, 128 L.Ed.2d 639 (1994) ("actual discrimination, wherever it is found, is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred").

¶16 The Court held there was no doubt the intangibles tax facially discriminated against interstate commerce. Fulton Corp., 516 U.S. at 333. It found facial discrimination "invokes the strictest scrutiny of any purported legitimate local purpose." Id. at 344 (quoting Hughes v. Oklahoma, 441 U.S. 322, 337, 99 S.Ct. 1727, 1737, 60 L.Ed.2d 250 (1979)). Because the tax was facially discriminatory, the burden was on the state to show the tax achieved "a legitimate local purpose that cannot be achieved through nondiscriminatory means." Id. at 344 (quoting Oregon Waste Systems, Inc. v. Dept. of Envtl. Quality of State of Or., 511 U.S. 93, 102, 114 S.Ct. 1345, 1352, 128 L.Ed.2d 13 (1994)). The Court found the state did not meet this burden and further said "we doubt that such a showing can ever be made outside the limited confines of sales and use taxes . . . ." Fulton Corp., 516 U.S. at 344.

¶17 In the present case, the deduction seeks to attract and retain the business of a company's primary headquarters. If the company performs the business of a primary headquarters in Oklahoma then those who have an ownership interest in that company may receive a 100% deduction from an asset sale. On the other hand, if the company does not perform the business of a primary headquarters in Oklahoma, regardless of the nature and extent of other business investment in Oklahoma, then those who have an ownership interest in that company receive a 0% deduction from an asset sale. In effect, this amounts to an out-of-state primary headquarters tax. Earnings from asset sales of non-Oklahoma Companies, those having an out-of-state primary headquarters, are taxed at a greater rate than those for Oklahoma Companies. Oklahoma Companies also receive an advantage over non-Oklahoma Companies by appearing more lucrative to investors. This scheme is similar to the one found to be facially discriminatory in Fulton.

¶18 The Tax Commission asserted there is no interstate commerce discrimination because a company is not prohibited from having multiple headquarters in other states. It argued the dormant Commerce Clause is not violated here because the deduction does not require a business to operate in-state if it could operate more efficiently elsewhere. The majority opinion also determined the primary headquarters requirement is not as coercive as the law in Pike v. Bruce Church, 397 U.S. 137, 145, 90 S.Ct. 844, 849, 25 L.Ed.2d 174 (1970). Even so, I disagree with the argument that the primary headquarters requirement does not require companies to perform operations in-state even though they may more efficiently operate elsewhere. In Pike v. Bruce Church, Inc., the Supreme Court said:

For the Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere. Even where the State is pursuing a clearly legitimate local interest, this particular burden on commerce has been declared to be virtually per se illegal.

Pike v. Bruce Church, Inc., 397 U.S. 137, 145, 90 S.Ct. 844, 849, 25 L.Ed.2d 174 (1970) (emphasis added). See also Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 336, 97 S.Ct. 599, 610, 50 L.Ed.2d 514 (1977).

The primary headquarters requirement places a discriminatory burden on interstate commerce by inducing companies to move their primary headquarters to Oklahoma and discouraging companies in Oklahoma from moving their primary headquarters out-of-state, even if those functions could be more efficiently performed elsewhere.

¶19 Although, it is true the deduction does not prohibit a company from having additional headquarters out-of-state, it still requires the primary headquarters be located in Oklahoma. The term "primary headquarters" is not defined in the statute, but surely, there is a difference in the functions of a primary headquarters from other headquarters.[21] The Legislature thought it significant enough to make the distinction. The Tax Commission asserted the primary headquarters requirement indicates a "significant investment" in Oklahoma.[22] The operations of a primary headquarters are what the deduction was intended to attract or retain in Oklahoma; otherwise, the Legislature would have simply used the term headquarters. It is not inconceivable that there will be situations where the functions of a primary headquarters could very well be performed more efficiently elsewhere.

¶20 I believe the deduction's primary headquarters requirement forecloses tax-neutral decision making and imposes an artificial rigidity on economic business patterns. It creates an advantage for companies operating their primary headquarters in Oklahoma as well as a disadvantage for those who operate their primary headquarters elsewhere, regardless of the extent of the company's investment in Oklahoma. This requirement is facially discriminatory or at least discriminatory in effect against interstate commerce and is unconstitutional under the dormant Commerce Clause. Strict scrutiny is the proper test to be applied and the Tax Commission has not met its burden of proof under this test.

FOOTNOTES

[1] Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 328, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977).

[2] Id.

[3] Panhandle Producers & Royalty Owners Ass'n v. Oklahoma Tax Comm'n, 2007 OK CIV APP 68, n. 19, 162 P.3d 960, n. 19 (approved for publication by the Oklahoma Supreme Court) (noting Mt. Hood Beverage Co. v. Constellation Brands, Inc., 63 P.3d 779 (Wash. 2003)).

[4] Koch Fuels, Inc. v. Oklahoma Tax Comm'n, 1993 OK 140, ¶33, 862 P.2d 471, 480.

[5] Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 332 n. 12, 97 S.Ct. 599, 602 n. 12, 50 L.Ed.2d 514 (1977).

[6] See Fulton Corp. v. Faulkner, 516 U.S. 325, 331, 116 S.Ct. 848, 854, 133 L.Ed.2d 796 (1996); Oregon Waste Systems, Inc. v. Dept. of Envtl. Quality of State of Or., 511 US 93, 99, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994).

[7] Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). See also Panhandle Producers & Royalty Owners Ass'n v. Oklahoma Tax Comm'n, 2007 OK CIV APP 68, ¶23, 162 P.3d 960 (approved for publication by the OK Supreme Court); Oregon Waste Systems, Inc. v. Dept. of Envtl. Quality of State of Or., 511 US 93, 99, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994); Dorrance v. McCarthy, 957 F.2d 761 (10th Cir. 1992). 

[8] Pike, 397 U.S. at 142. See also Panhandle, at ¶23 and Dorrance, 957 F.2d at 763.

[9] Panhandle, at ¶23. See also Dorrance, 957 F.2d at 763; Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).

[10] Dorrance, 957 F.2d at 763.

[11] Oregon Waste Systems, Inc. v. Dept. of Envtl. Quality of State of Or., 511 U.S. 93, 100, 114 S.Ct. 1345, 1351, 128 L.Ed.2d 13 (1994).

[12] Hughes, 441 U.S. at 336.

[13] United Haulers Ass'n, Inc., v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338, 127 S.Ct. 1786, 1793, 167 L.Ed.2d 655 (2007); Oregon Waste Systems, Inc., 511 U.S. at 99.

[14] Oregon Waste Systems, Inc., 511 U.S. at 99-100.

[15] Oregon Waste Systems, Inc., 511 U.S. at 101.

[16] Id. See also Hughes, 441 U.S. at 336 (quoting Hunt v. Washington Apple Adver. Comm'n, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 l.Ed.2d 383 (1997)) ("[w]hen discrimination against commerce . . . is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake."

[17] Camps Newfoundland/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 582, 117 S.Ct. 1590, 1601, 137 L.Ed.2d 852 (1997) (quoting Oregon Waste Systems, Inc.,511 U.S. at 101). See also Hughes, 441 U.S. at 337 (quoting Philadelphia v. New Jersey, 437 U.S. 617, 626, 98 S.Ct. 2531, 2537, 57 L.Ed.2d 475 (1978) ("[s]uch facial discrimination by itself may be a fatal defect, regardless of the State's purpose, because 'the evil of protectionism can reside in legislative means as well as legislative ends.'")).

[18] See the provisions of 26 U.S.C. § 1361 et seq. In Bufferd v. Comm'r of Internal Revenue, 506 U.S. 523, 524-525, 113 S.Ct. 927, 928-929, 122 L.Ed.2d 306 (1993), the United States Supreme Court explained that the purpose of the special tax status afforded by Subchapter S of the Internal Revenue Code, is "to eliminate tax disadvantages that might dissuade small businesses from adopting the corporate form and to lessen the tax burden on such businesses." The primary advantage of a Subchapter S corporation is the avoidance of taxation at both the corporate and individual shareholder level. Under Subchapter S, taxable income is determined at the corporate level, but is passed through to the S corporation's shareholders and taxed to them at their individual rates, in a manner similar to the tax treatment afforded partnerships. See Blitz U.S.A., Inc. v. Oklahoma Tax Comm'n, 2003 OK 50, ¶2, 75 P.3d 883, 884.

[19] The Tax Commission made this assertion in Exhibit A to its Response to Petition in Error and in its Answer Brief on appeal.

[20] Koch Fuels, Inc. v. State ex rel. Oklahoma Tax Comm'n, 1993 OK 140, ¶18, 862 P.2d 471, 476.

[21] At oral argument on January 28, 2014, the Tax Commission acknowledged "primary headquarters" was not defined in statute but described "primary headquarters" as the "nerve center" of the corporation. CDR is a Subchapter S corporation with a single shareholder who lives in Florida.

[22] CDR asserted it made a significant investment in Oklahoma by having a physical plant located in Waynoka, Oklahoma.

 

 





 Citationizer© Summary of Documents Citing This Document
Cite
 Name
 Level
 None Found.
Citationizer: Table of Authority
Cite
 Name
 Level
 Oklahoma Court of Civil Appeals Cases Cite
Name
Level 2007 OK CIV APP 68, 162 P.3d 960, PANHANDLE PRODUCERS v. OKLAHOMA TAX COMMISSION
Discussed at Length
Oklahoma Supreme Court Cases Cite
Name
Level 1989 OK 9, 780 P.2d 665, 60 OBJ 130, Income Tax Protest of Flint Resources, Matter of
Discussed 1993 OK 140, 862 P.2d 471, 64 OBJ 3276, Koch Fuels, Inc. v. State ex rel. Oklahoma Tax Com'n
Discussed at Length 2003 OK 50, 75 P.3d 883, BLITZ U.S.A., INC. v. OKLAHOMA TAX COMMISSION
Discussed 2008 OK 95, 196 P.3d 511, EOG RESOURCES MARKETING v. OKLAHOMA STATE BD. OF EQUALIZATION
Discussed 2011 OK 53, 260 P.3d 1251, THOMAS v. HENRY
Discussed 1999 OK 64, 984 P.2d 200, 70 OBJ 2100, Fent v. Oklahoma Capitol Improvement Authority
Discussed
Title 68. Revenue and Taxation Cite
Name
Level 68 O.S. 2357.7, Credit Against Tax for Investments in Qualified Venture Capital Companies - Pass-Through Entities
Cited 68 O.S. 2353, Definitions
Cited 68 O.S. 2357.4, Tax Credit for Investments
Cited 68 O.S. 2358, Taxable Income and Adjusted Gross Income - Adjustments to Arrive at Oklahoma Taxable Income
Discussed at Length